# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

James V. King, : 
                Petitioner : 
             : 
        v. :   No. 762 C.D. 2017
          :   Submitted: April 12, 2018
Unemployment Compensation : 
Board of Review, : 
               Respondent : 


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
                 HONORABLE ELLEN CEISLER, Judge
                 HONORABLE DAN PELLEGRINI, Senior Judge


**OPINION NOT REPORTED**


**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**            **FILED: May 7, 2018**


James V. King (Claimant) petitions for review of the Order of the Unemployment Compensation (UC) Board of Review (Board) affirming the decision of a UC Referee finding Claimant ineligible for UC benefits under Section 402(e) of the UC Law[1] because he was discharged for willful misconduct. On appeal, Claimant argues the findings of fact that support the determination that he engaged in willful misconduct are not supported by substantial evidence in the record and that, even if they are, he had good cause for his actions. Because the

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e) (stating that an employee is ineligible for UC benefits for any week that "his unemployment is due to his discharge . . . from work for willful misconduct connected with his work").

necessary findings of fact are supported by substantial evidence and Claimant did not establish good cause for his actions, we affirm.

Claimant worked for the Towanda Area School District (Employer) as a special education teacher until his discharge. (Referee Decision, Findings of Fact (FOF) ¶¶ 1, 13.) Claimant filed an application for UC benefits claiming he was suspended, and then discharged, for allegedly abusing a student. (Internet Initial Claims, R. Item 2.) Employer submitted a questionnaire to which it attached a statement of charges[2] describing allegations related to Claimant's treatment of a particular student (Student) with intellectual and developmental disabilities. (Employer Questionnaire, R. Item 4.) The allegations included, *inter alia*, Claimant's excluding Student from the classroom, aggressively pushing Student's wheelchair, and denying Student hot food for disciplinary reasons. The local UC Service Center found Claimant ineligible for benefits because he acted in "willful disregard of the Employer's interests" and there was "insufficient information provided to indicate whether the Claimant had good cause for his actions." (Notice of Determination, R. Item 6.)

Claimant appealed, arguing the local Children and Youth Services (CYS) had determined the allegations that he abused Student were "unfounded."[3] (Claimant's Petition for Appeal, R. Item 7.) The appeal was assigned to a Referee, who held telephone hearings at which both parties were represented by counsel. Employer presented the testimony of two personal care aides, a paraprofessional, a special

---

[2] The statement of charges was sent to Claimant and directed him to appear at an investigatory hearing to determine if he engaged in employee misconduct that would warrant discipline. It listed 14 reasons why the investigatory hearing was being held.

[3] In its letter to Claimant, CYS stated the report was "[u]nfounded because of one of the following: (1) the incident did not occur, (2) the injury was not of a serious nature, or (3) substantial evidence was not found." (Ex. to Claimant's Petition for Appeal, R. Item 7.)

education teacher, and a classroom aide, all of whom were familiar with Claimant and Student. Claimant testified on his own behalf.

Personal Care Aide One testified she was in Claimant's life skills classroom one period a day. (Hr'g Tr., Mar. 28, 2017, at 14, R. Item 10.) She observed Claimant pushing Student's wheelchair aggressively into the bathroom, where the lights would be turned off and the door partially closed, and Student, who is completely non-verbal and has an Individualized Education Plan (IEP), would remain there for anywhere between minutes and hours. This would occur two to three times a week, depending on Student's behavioral issues, which included spitting when he was angry and throwing his arms out and hitting something. She explained, however, that "[w]e're not allowed to seclude students" by singling them out and they were to "try to do whatever [they] can to keep the students in the room with [them] together." (*Id.* at 19.) There were times, Personal Care Aide One stated, when a hot lunch would be left for Student but "it would end up cold by the time he got it." (*Id.* at 16.) She noted that Student's behavior improved after Claimant left. She did not report Claimant's behavior because she felt intimidated by Claimant, but she eventually discussed her observations with Employer's Special Education Director in November 2016.

Paraprofessional testified she spent afternoons in the special education classroom next to Claimant's classroom, which shares a common area with Claimant's classroom. She agreed that Student has his own one-on-one aide through Bayada Nursing (Bayada Aide), who was not present at the hearing. Paraprofessional observed Claimant "vigorously" wheeling or shoving Student's wheelchair twice and Student frequently being left in the common area alone with the lights off. Paraprofessional indicated it was not common to exclude a student

3

from the classroom. However, she had observed that when Student was not in the classroom, the Bayada Aide was with him. Paraprofessional did not advise Employer of her concerns because she "tend[ed] to mind [her] own business." (*Id.* at 26.) She explained that Student's behavior improved after Claimant was discharged.[4]

Special Education Teacher testified her classroom was next to Claimant's classroom, and she had concerns regarding Claimant's treatment of Student's behavioral issues, which she agreed included continuous spitting. According to Special Education Teacher, she offered suggestions to Claimant about using techniques other than exclusion with Student, and Employer provided yearly training, which Claimant attended, in using positive behavior techniques to calm students before their behavior escalates "and then if there's no other way of calming them down then we have different holds and things." (*Id.* at 33-35.) This training, she explained, had teachers "try to find out the triggers and antecedents to the behavior and try to help figure out what you can do to stop the behavior before it starts" and to change negative behavior into a different behavior. (*Id.* at 35.) Special Education Teacher testified that not every student with an IEP has a behavior plan. In response to a question on whether she used "exclusions as part of [a] positive behavior support plan for students," Special Education Teacher stated she did not because "we don't like to leave our students out of the classroom . . . unless their behavior is so bad that [it] puts the students at risk." (*Id.* at 36.) Like the others, Special Education Teacher observed Student being placed in "time out" on a daily

---

[4] Personal Care Aide Two explained she worked in the other special education classroom and observed Claimant pushing Student's wheelchair roughly on one occasion. Like the others, Personal Care Aide Two did not report her observations to Employer until the investigation into Claimant's actions occurred.

basis. She eventually contacted Employer's Special Education Director to express her concerns.

Classroom Aide testified she was an aide in Claimant's classroom and observed behavior she thought was unprofessional and concerning, in particular Claimant's pushing Student's wheelchair aggressively, placing Student in time outs that could last for hours on an almost daily basis due to Student's spitting, and sometimes turning out the lights in the bathroom while Student was in time out. She had never worked with a teacher that used daily time outs as a behavior strategy. Classroom Aide had observed Claimant withhold lunch from students. She complained to her supervisors about Claimant's behavior approximately two weeks before he was discharged.[5]

Claimant testified he was a full-time special education teacher for Employer and is licensed and certified by the Pennsylvania Department of Education. (Hr'g Tr., Apr. 7, 2017, at 7, R. Item 13.) Employer assigned him for the 2016-2017 school year to a life skills class, teaching students with moderate to profound disabilities about, *inter alia*, personal hygiene, daily life skills, and interacting with others. Claimant responded to each of the relevant allegations set forth in the statement of charges as follows.

Claimant disagreed he pushed Student's wheelchair in an "aggressive" fashion, explaining he needed to push Student's wheelchair in a particular way to

---

[5] Employer also presented the testimony of its Business Manager, who identified Employer's Policy 340, which was admitted as evidence and addresses employee responsibilities for student welfare. (Hr'g Tr., Mar. 28, 2017, at 50; Hr'g Tr., Apr. 7, 2017, at 3, R. Item 13.) In relevant part, Policy 340 states that "employees are responsible for the safety of students in their charge within school buildings and on district property," and the "employee shall maintain a standard of care and concern for supervision, control and protection of students, commensurate with assigned duties and responsibilities." (Policy 340, R. Item 12.) This policy is not referenced by any party in this appeal.

navigate because "the doorways are too close," to counter-balance Student's attempts to knock over the wheelchair, and to avoid Student's falling out of the chair. (*Id.* at 10-11.) Claimant disputed the characterization that he placed Student alone in a dark bathroom three to four times a week for lengthy periods of time. According to Claimant, Student was placed in the bathroom but was never alone because the Bayada Aide was with him unless he became too violent and then she would stand in the doorway with the door opened part way. Student would be checked every three to five minutes to assess his mood and demeanor and, if Student's demeanor improved, he would return to class. He stated this technique was instituted when Student "was in a violent outburst, [engaging in] aggressive behaviors and basically creating an unsafe environment for [the] other students in the classroom." (*Id.* at 11.) This approach, Claimant testified, "was proposed by a personal care aide due to a technique . . . used a year prior[ by] the previous teacher that had that classroom" and worked on occasion. (*Id.*) He explained that dark rooms and natural sunlight were positive factors that helped modify Student's behaviors and mood. Claimant spoke with his supervisors regarding using this technique and was never told it was inappropriate or should be stopped. With regard to the claims he withheld hot food as punishment, Claimant stated there were times when Student may have been given, for the safety of Student and others in the classroom, different food or an alternate choice to a hot lunch if Student had been throwing his bowls, plates, or cups. Claimant explained he could not force feed Student and, if Student did not eat the food after being given the opportunity to do so, Claimant would discard the food, *i.e.*, if Student did not eat breakfast, that food would be discarded when lunch arrived.

Claimant testified he was investigated by CYS and the local police department based on the allegations against him, which resulted in an unfounded report and no charges being filed. On cross-examination, Claimant agreed that, for special education students, everyone involved with the student was to follow the student's IEP. He was not certain whether there was a behavioral plan in Student's IEP but believed the IEP did not include any particular behavioral strategy beyond "basically alternating [Student's] mood or basically a safety factor." (*Id.* at 19-20.) Claimant indicated he had attended professional development classes involving varying techniques, including adjusting "light and mood stimulation" to help calm students because "students with severe profound [disabilities are] stimulated very much more by light, energy, vibrations, things on that line," but he could not recall the name of the particular course. (*Id.* at 23.) Claimant agreed that he used this technique with Student approximately three to four times a week.

Following the hearing, the Referee rendered a decision affirming the Service Center's determination. The Referee made the following, relevant findings of fact:

3. The claimant's primary job duties for the 2016/2017 school year were to teach life skills to students with intellectual and developmental disabilities.

4. The claimant was required to adhere to each student's [IEP], which was developed by the claimant, classroom aides, and each student's parents.

5. The employer provided training to the claimant, which included positive reinforcement for students.

6. The employer's [IEPs] and behavioral support plans do not allow a student to be excluded from the classroom.

7. On November 18, 2016, the employer received allegations that the claimant acted in an inappropriate manner with student on

7

numerous occasions and had failed to follow the student's [IEP] during September 2016, October 2016[,] and November 2016.

8. The student was assigned an aide from an outside agency, Bayada Services [sic].

9. Due to the student's frequent outbursts, the claimant directed the Bayada Services [sic] aide to put the student in a bathroom with the lights out approximately three to four times per week.

10. The claimant directed the Bayada Services [sic] aide to be in the bathroom with the student, but the Bayada Services [sic] aide would occasionally have to stay out of the bathroom due to the student's outbursts.

11. The employer's personal aide observed the claimant withhold food from the student in question.

12. On November 21, 2016, the employer suspended the claimant based upon the allegations which were received from the employer's personal care aides, paraprofessional[,] and another special education teacher.

13. On December 5, 2016, the employer's Board of Education terminated the claimant.

(FOF ¶¶ 3-13.)  Although Claimant denied the allegations against him, the Referee held that Claimant admitted "that he placed a student in a bathroom with the lights out based upon the recommendation from the Bayada . . . [A]ide" and that "another special education teacher testified that the employer provided training that exclusion of students from the classroom is never a part of a student's [IEP]."  (Referee Decision at 3.)  The Referee found, *inter alia*, that Claimant had been observed roughly pushing Student in his wheel chair and that, even though Claimant was unaware whether Student had a behavioral plan as part of his IEP, he was aware that Student had behavioral issues.  Concluding that, even if Employer had not substantiated all of its allegations, it had established by Special Education Teacher's

8

"credible testimony that the claimant failed to follow the student's [IEP] and acted contrary to the employer's interests." (*Id.*) Therefore, the Referee held that Claimant's actions constituted willful misconduct.

Claimant appealed to the Board asserting Employer had not met its burden of proof, the finding of fact that the prohibition against exclusion was part of Student's IEP was not supported by substantial evidence, and Claimant removed Student from the classroom for safety reasons. After reviewing the entire record, the Board concluded the Referee's decision was in accordance with the UC Law and affirmed that decision. However, the Board clarified "that the prohibition against student exclusion was not particular to this student's [IEP], but was a general employer policy." (Bd. Order.) Further, the Board observed that "[w]hether the claimant avoided legal or regulatory punishment is immaterial to whether his actions constituted disqualifying willful misconduct." (*Id.*) Accordingly, the Board adopted and incorporated the Referee's findings of fact and conclusions of law as its own, and affirmed. Claimant now petitions this Court for review.[6]

On appeal, Claimant argues the findings that support the conclusion that he engaged in willful misconduct are not supported by substantial evidence. He maintains that Employer did not introduce Student's IEP into evidence, and none of Employer's witnesses testified as to the IEP's contents. Rather, Claimant argues, Special Education Teacher testified that "exclusion is a technique that can be used if '[the students'] behavior is so bad that [it] puts the students at risk.'" (Claimant's Br. at 25 (quoting Hr'g Tr., Mar. 28, 2017, at 36).) Claimant asserts he had a

---

[6] Our review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. *Johns v. Unemployment Comp. Bd. of Review*, 87 A.3d 1006, 1009 n.2 (Pa. Cmwlth. 2014).

reasonable basis for his actions. Thus, Claimant maintains, there is nothing to support the findings that his actions rose to the level of willful misconduct.

The Board responds it did not adopt the Referee's finding that Student's IEP prohibited exclusion, but found that Employer prohibited exclusion of students as a general policy. Thus, whether Employer submitted the IEP or not is immaterial because it is the Board's finding that is relevant. The Board further argues that Employer's witnesses' testimony, and the reasonable inferences deducible therefrom, supports its finding "that Employer's policy generally prohibited student exclusion" and, therefore, that finding is binding on this Court. (Bd.'s Br. at 7-8.) The Board asserts Claimant is really challenging its credibility determinations, which are beyond this Court's review. It maintains Claimant's assertions that he had safety reasons for his actions are merely denials of the accusations or that he violated Employer's policies and are insufficient to establish good cause for his actions. In the alternative, the Board argues that Claimant's withholding of food from Student, even in the absence of a specific policy, was willful misconduct because it is conduct that is so inimical to Employer's interests that his discharge was a natural result.

Employer, which has intervened, argues the Board credited its witnesses' testimony that Claimant did not follow the requirements of Student's IEP, as required both by federal law and Employer's policies. While Employer concedes it did not introduce Student's IEP, it maintains the testimony supports this finding. This, Employer contends, was a violation of the Individuals with Disabilities Education Act[7] and constitutes willful misconduct.

Section 402(e) of the UC Law provides that a claimant is ineligible for benefits for any week "[i]n which his unemployment is due to his discharge or

---

[7] 20 U.S.C. §§ 1400-1482.

10

temporary suspension from work for willful misconduct connected with his work." 43 P.S. § 802(e). Although "willful misconduct" is not defined in the UC Law, our Supreme Court has held that the term means:

> a) wanton or willful disregard for an employer's interests; b) deliberate violation of an employer's rules; c) disregard for standards of behavior which an employer can rightfully expect of an employee; or d) negligence indicating an intentional disregard of the employer's interest or an employee's duties or obligations.

*Navickas v. Unemployment Comp. Bd. of Review*, 787 A.2d 284, 288 (Pa. 2001). Where a finding of willful misconduct is based on a rule violation, the burden is on the employer to prove "the existence of the rule, the reasonableness of the rule and the fact of its violation." *Eshbach v. Unemployment Comp. Bd. of Review*, 855 A.2d 943, 947 (Pa. Cmwlth. 2004) (emphasis omitted). "The employer also must present evidence that the employee deliberately violated the rule." *Id.* (emphasis omitted). Whether conduct amounts to willful misconduct requires consideration of "all of the circumstances, including the reasons for the employee's noncompliance with the employer's directives." *Rebel v. Unemployment Comp. Bd. of Review*, 723 A.2d 156, 158 (Pa. 1998). If the employer meets its burden of proof, the burden shifts to the claimant to prove that he had good cause for his actions. *Guthrie v. Unemployment Comp. Bd. of Review*, 738 A.2d 518, 522 (Pa. Cmwlth. 1999).

Claimant's argument is that the findings related to his exclusion of Student being willful misconduct are not supported by substantial evidence. Substantial evidence is "relevant evidence upon which a reasonable mind could base a conclusion." *Henderson v. Unemployment Comp. Bd. of Review*, 77 A.3d 699, 718 (Pa. Cmwlth. 2013). "In determining whether there is substantial evidence to support the Board's findings, this Court must examine the testimony in the light most

11

favorable to the prevailing party, giving that party the benefit of any inferences that can logically and reasonably be drawn from the evidence." *Id.* "It is irrelevant whether the record contains evidence to support findings other than those made by the fact-finder; the critical inquiry is whether there is evidence to support the findings actually made." *Ductmate Indus., Inc. v. Unemployment Comp. Bd. of Review*, 949 A.2d 338, 342 (Pa. Cmwlth. 2008). "The Board is the ultimate fact-finding body in unemployment matters and is empowered to resolve conflicts in evidence, to determine what weight is to be accorded the evidence, and to determine the credibility of witnesses." *Allen v. Unemployment Comp. Bd. of Review*, 638 A.2d 448, 450 (Pa. Cmwlth. 1994). The Board's findings are conclusive on appeal if the record taken as a whole contains substantial evidence to support them. *Henderson*, 77 A.3d at 718.

While Employer and Claimant focus on the finding that Student's IEP prohibited Student's exclusion from the classroom, the Board did not adopt this finding as its own. It is well-settled that "[w]hen the Board makes its own findings of fact, it is the Board's findings, not the referee's, that are subject to our review." *Allen*, 638 A.2d at 450. Thus, the Referee's finding is not before this Court. Rather, it is the Board's finding "that the prohibition against student exclusion was not particular to this student's [IEP], but was a general employer policy," (Board's Order), that we are reviewing.[8]

---

[8] We note that, to the extent Claimant's argument is based on the best evidence rule, *see* Pennsylvania Rule of Evidence 1002, Pa.R.E. 1002 (providing that "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules, other rules prescribed by the Supreme Court, or a statute provides otherwise"), this is a technical rule of evidence that is generally not applicable to administrative hearings. Section 505 of the Administrative Agency Law, 2 Pa. C.S. § 505; *DiLucente Corp. v. Pa. Prevailing Wage Appeals Bd.*, 692 A.2d 295, 298 (Pa. Cmwlth. 1997). Accordingly, Employer was not required to produce

The Board argues its finding is supported by the testimony of Employer's witnesses who stated they were "not allowed to seclude students," and "we don't like to leave our students out of the classroom . . . unless their behavior is so bad that [it] puts the students at risk," and agreed it was not "common to exclude a student outside the classroom setting." (Hr'g Tr., Mar. 28, 2017, at 19, 27, 36.) We agree the testimony cited by the Board is substantial evidence that supports the finding that Employer has a general policy against excluding students from the classroom. All of Employer's witnesses testified to observing Claimant excluding Student from the classroom, and Claimant admitted that he excluded Student from the classroom by placing Student in a bathroom for varying lengths of time multiple times a week. This testimony supports the finding that Claimant violated Employer's policy against exclusion. Therefore, Employer met its burden of proving willful misconduct in this regard.

As for the Board's finding that Claimant withheld food from Student, an action that would be inimical to Employer's interests, we note that the Referee's decision, adopted by the Board, did not give this reason as an explicit basis for concluding that Claimant committed willful misconduct. (Referee's Decision at 3.) Notwithstanding this, two of Employer's witnesses testified that Claimant withheld hot food from Student or that the food would be cold by the time Student would get it. (Hr'g Tr., Mar. 28, 2017, at 16, 45.) In making the finding that Claimant withheld

---

Student's IEP to demonstrate its contents, but could rely on other evidence to do so. As for that other evidence, having reviewed the record we, like the Board, would conclude it is not supported by substantial evidence. Special Education Teacher explained that some, but not all, IEPs contained a behavioral plan, and she did not testify to the contents of Student's IEP or that exclusion is never a part of an IEP. Employer's other witnesses likewise provided no testimony regarding the contents of Student's IEP. Claimant testified he was unaware whether there was a specific behavioral plan for Student in Student's IEP beyond trying to "alternate" Student's mood for safety reasons. (Hr'g Tr., Apr. 7, 2017, at 19-20.)

food, the Referee, and Board, implicitly credited Employer's witnesses' testimony. Such credited testimony supports the finding made and a determination that Claimant's actions rose to the level of willful misconduct. Thus, the Board did not err in holding that Employer met its burden in proving that Claimant's actions constituted willful misconduct, and the burden shifted to Claimant to establish good cause for his actions. *Guthrie*, 738 A.2d at 522.

Claimant argues he had a reasonable basis for his actions, which could be considered a "good cause" argument. "A claimant has good cause if his or her actions are justified and reasonable under the circumstances." *Kelly v. Unemployment Comp. Bd. of Review*, 747 A.2d 436, 439-40 (Pa. Cmwlth. 2000).

Relying on Special Education Teacher's testimony that exclusion may not be used "unless their behavior is so bad that [it] puts the students at risk," (Hr'g Tr., Mar. 28, 2017, at 36), Claimant cites Student's behavior and frequent outbursts as justifying his exclusion of Student from the classroom. However, Special Education Teacher's testimony reflects that exclusion should have been used as a last resort and not unless other students were at risk by the behavior. Special Education Teacher also explained that she discussed alternatives with Claimant on how to resolve or treat Student's behaviors. Claimant did not testify that he tried any other less restrictive techniques to deal with Student's behavior before excluding Student from the classroom. Claimant acknowledged that he excluded Student from the classroom three to four times a week for varying lengths of time, and Employer's witnesses testified that these exclusions could last anywhere from a few minutes to hours. While he indicated he removed Student to prevent an unsafe environment, Claimant provided no explanation why less restrictive means could not be implemented. Finally, Claimant's justification for beginning to use this technique

14

was that he had been advised by an aide that it had been used for Student in the past. However, Employer's witnesses testified that Student did not have any behavioral issues in the past, and Claimant also testified that he had understood that there were no behaviors of concern prior to the 2016/2017 school year. (Hr'g Tr., Apr. 7, 2017, at 19-20.) Under these circumstances, Claimant's admitted use of exclusion on a near daily basis was not reasonable and justified and, therefore, did not provide him good cause for his actions.[9]

Accordingly, we affirm the Board's Order.

_____
**RENÉE COHN JUBELIRER,** Judge

---

[9] Because of our resolution of this issue, we do not address Claimant's asserted explanations related to the withholding of food from Student.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

James V. King,                          :
                          Petitioner        :
                                 :
                v.                       :    No. 762 C.D. 2017
                                 :
Unemployment Compensation               :
Board of Review,                        :
                        Respondent        :

## O R D E R

NOW, May 7, 2018, the Order of the Unemployment Compensation Board of Review, entered in the above-captioned matter, is **AFFIRMED**.

 

                                     _____

                                     **RENÉE COHN JUBELIRER,** Judge